Annie **LEIBOVITZ**, Plaintiff,

v.

**PARAMOUNT PICTURES CORPORATION,**
Defendant.

No. 94 Civ. 9144 (LAP).

United States District Court,
S.D. New York.

Dec. 18, 1996.

---

Tennyson Schad, Norwick & Schad, New York City, for Annie Leibovitz.

Jonathan Zavin, Richards & O'Neil, LLP, New York City, for Paramount Pictures Corporation.

### MEMORANDUM AND ORDER

PRESKA, District Judge:

This action examines the extent to which a parody that appears in the form of an advertisement can constitute a fair use of a copyrighted work. Plaintiff is a well-known photographer who shot a photograph of the actress Demi Moore that appeared on the August, 1991 cover of *Vanity Fair*. Ms. Moore was eight months pregnant and nude in the photo, the publication of which aroused a great deal of controversy. It is undisputed that plaintiff is the sole owner of the copyright in this photograph. In 1993, the defendant was developing advertising in connection with the release of its film, *Naked Gun: The Final Insult 33⅓*. The defendant eventually selected a "teaser" ad which it contends was a parody of the *Vanity Fair* cover. In the advertisement, a model who was also eight months pregnant was photographed against a backdrop similar to that used in the Demi Moore photograph; the lighting and pose were also similar to the Moore photograph. Further, the photograph was subjected to some computer manipulation in order to duplicate the skin tone and body configuration that appeared in the Moore photo. On top of the second model's body, however, appeared a photograph of the face of Leslie Nielsen, the star of the *Naked Gun* series of films. In contrast to Ms. Moore's expression of fulfillment, serenity, and pride, Mr. Nielsen's face wore a guilty smirk. Underneath the photo ran the legend "Due This March."

Plaintiff brought suit, charging that the advertisement infringed her copyright in the Moore photograph. Defendant conceded that plaintiff owns the copyright in the photograph and that its advertisement targeted the Moore photograph, but contended that the ad was a parody and a fair use of plaintiff's copyrighted work. The parties made cross-motions for summary judgment. For the reasons that follow, plaintiff's motion for summary judgment is denied, and defendant's motion for summary judgment is granted.

### BACKGROUND

Plaintiff Annie Leibovitz is a professional photographer whose work has earned international acclaim. (Affidavit of Annie Leibovitz, sworn to on June 28, 1996, ¶ 2). She serves as an independent contractor with Conde Nast, the publisher of *Vanity Fair* magazine. (Leibovitz Aff., ¶ 2). In 1991, pursuant to her exclusive contract with Conde Nast, Ms. Leibovitz shot a series of photographs of actress Demi Moore. Ms. Moore was eight months pregnant at the time and posed in the nude for some of the photographs. (Leibovitz Aff., ¶¶ 6–8). One of the nude photographs was ultimately selected for publication as the August, 1991 cover of *Vanity Fair*. (Leibovitz Aff., ¶ 7). The cover aroused a great deal of controversy and public commentary at the time of its publication. (Leibovitz Aff., ¶ 8, Deposition of Annie Leibovitz, p. 25; Declaration of Nathan Grant, sworn to June 25, 1996, ¶ 6). For a substantial period of time (until, in fact, its displacement by another Leibovitz cover), the August, 1991 issue was the best-selling single issue of *Vanity Fair*. (Deposition of Jeffrey D. Smith, p. 46). The August, 1991 issue of *Vanity Fair* was duly registered for copyright by Conde Nast in July, 1991 under Registration No. 3 109 469. (Leibovitz Aff., ¶ 2). Plaintiff, as the photographer, is the undisputed owner of the copyright in the Moore photograph. (Leibovitz Aff., ¶ 2).

In 1991, *Spy* magazine featured a parody of the Moore photograph on the cover of its September issue. (Grant Decl., ¶ 9). The cover consisted of a photograph of the face of

Bruce Willis, Ms. Moore's husband, superimposed on the computer-manipulated body of a pregnant man. (Grant Decl., Exhibit A). Although Ms. Leibovitz was aware of this cover, neither she nor anyone else registered any objection to it. (Deposition of Annie Leibovitz, pp. 32–34).

In August, 1993, defendant Paramount hired Dazu, Inc., an outside advertising agency, to develop a "teaser" campaign for the upcoming release of the film, *Naked Gun 33⅓: The Final Insult.* (Grant Decl., ¶ 3). A teaser campaign is a brief campaign designed to pique the public's interest in a forthcoming movie and give a hint of the plot. (Grant Decl., ¶ 3). According to Paramount's Executive Vice President for Creative Advertising, the main theme of *Naked Gun 33⅓* centers around the protagonist's struggle with his new life as a retired police detective and pressure from his wife to start a family. In the midst of this crisis, the detective is called upon to prevent a mad bomber (and his mother) from blowing up the Academy Awards ceremony. (Declaration of Lucia Ludovico, sworn to on July 1, 1996, ¶ 4). Paramount provided Dazu with a copy of the script and requested that Dazu develop teaser ads that would be in line with the no-holds-barred humor that characterized the *Naked Gun* series of films. (Ludovico Decl., ¶ 5).

In response to this request, the agency provided several options. Among its suggestions was a hybrid photograph featuring the smirking face of Leslie Nielsen, the actor featured in the *Naked Gun* films, engrafted onto Ms. Moore's pregnant, nude body from the *Vanity Fair* cover. (Ludovico Decl., ¶ 6; Grant Decl. ¶ 6). Paramount's executive Vice President for Creative Advertising stated that she believed that the Nielsen ad, which "lampooned the controversial and 'serious' Moore Photo, was perfectly in keeping with the *Naked Gun* brand of irreverent parodic humor." (Ludovico Decl., ¶ 7). In addition, the proposed ad was linked to the themes of marriage and childbearing that were central to the movie's plot.

Once Paramount had selected the Nielsen ad, Dazu sought out and hired another model, who was also eight months pregnant, to serve as a body double for Ms. Moore. (Grant Decl., ¶ 10). Dazu posed the model in a manner similar to Ms. Moore's photograph, against a similar backdrop, with similar lighting. (Grant Decl., ¶ 10). The photograph was also digitally modified to more faithfully replicate the body configuration and skin tone that appeared in the *Vanity Fair* cover. (Grant Decl., ¶ 10; Deposition of Kevin Stapleton, pp. 16–17). Dazu and its contractors then superimposed the smirking, guilty face of Leslie Nielsen on the second model's body and added the words beneath the photograph, "Due This March." (Leibovitz Aff., Exh. C). Neither Dazu nor Paramount ever requested permission to use the *Vanity Fair* cover from Ms. Leibovitz or Conde Nast.

The Nielsen ad ran in several magazines, including *Vanity Fair,* nationally in January and February, 1994. Nathan Grant received two industry awards for his work on the Nielsen ad. (Grant Decl., ¶ 12). Publication of the ads ceased sometime around February, 1994. In March, 1994, counsel for Ms. Leibovitz informed Paramount that it viewed the Nielsen ad as an infringement of the Moore photograph. Paramount responded that the ad was a parody and therefore noninfringing, and that the ad was no longer in use. In December, 1994, plaintiff instituted the present suit. The parties have cross-moved for summary judgment. Both parties agree that in the absence of a fair use defense, the Nielsen ad infringes the Moore photograph. The dispositive issue before me, then, is whether the Nielsen ad constituted a fair use of the Moore photograph.

## DISCUSSION

### I. *Summary Judgment Standard*

Under Rule 56(c), summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. § 56(c); *see Anderson v. Liberty Lobby,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The substantive law determines which facts are material to the outcome of a particular litigation. *See Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511; *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir. 1975). In determining whether summary judgment is appropriate, a court must resolve all ambiguities, and draw all reasonable inferences against the moving party. *See Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986) (citing *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

If the moving party meets its burden, the burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355. Only when it is apparent, however, that no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight" should summary judgment be granted. *Gallo v. Prudential Residential Services, Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir. 1994).

■ Because of the factual nature of many aspects of a copyright case, a district court should be especially wary of granting summary judgment in cases alleging copyright infringement. *See Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 977 (2d Cir.) (summary judgment traditionally frowned upon in copyright litigation), *cert. denied,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980). In cases involving the fair use doctrine in particular, such as the instant case, "[b]ecause the fair use question is so highly dependent on the particular facts of each case, courts ... have usually found it appropriate to allow the issue to proceed to trial." *Max-*

*tone–Graham v. Burtchaell,* 803 F.2d 1253, 1258 (2d Cir.1986), *cert. denied,* 481 U.S. 1059, 107 S.Ct. 2201, 95 L.Ed.2d 856 (1987).

A number of cases in this circuit have demonstrated, however, that summary judgment on the fair use issue is appropriate under some circumstances. Several cases, for example, have upheld the granting of summary judgment in favor of defendant when there has been a finding that no copyrightable material was taken or when a finding of fair use was made as a matter of law. *See, e.g., Wright v. Warner Books,* 953 F.2d 731 (2d Cir.1991) (use of copyrighted material not unfair as a matter of law); *Maxtone–Graham,* 803 F.2d 1253 (same); *Hoehling,* 618 F.2d 972 (summary judgment appropriate when no copyrighted material taken). Alternatively, other cases in this circuit have made it clear that a rejection of the fair use defense and a subsequent finding in favor of a copyright plaintiff also may be appropriate at the summary judgment stage. In *Rogers v. Koons,* 960 F.2d 301, 307 (2d Cir.), *cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992), for example, the Court of Appeals held that summary judgment in favor of plaintiff on the fair use issue was proper when the direct evidence is undisputed, or when the evidence was such that no reasonable jury could differ. *See id.; see also United Feature Syndicate, Inc. v. Koons,* 817 F.Supp. 370 (S.D.N.Y.1993) (granting summary judgment in favor of plaintiff after rejecting fair use defense).

In the present case, the very comprehensive submissions of the parties leave no factual issues concerning which additional, noncumulative evidence is likely to be presented at trial. *See Steinberg v. Columbia Pictures Industries, Inc.,* 663 F.Supp. 706, 709 (S.D.N.Y.1987). Further, one critical fact distinguishes this case from most copyright infringement actions, in which it is preferable to leave the determination of the issue to a jury: each party has contended that its case is complete by moving for summary judgment. *Id.* The parties' statements pursuant to Rule 3(g) make it clear that no dispute exists as to any material facts (although the parties vigorously dispute the conclusions to be drawn from those facts). In the interests

of judicial economy, therefore, summary judgment is appropriate.

## II. *Copyright Infringement*

To establish a claim for copyright infringement of a protected work, a plaintiff must show both ownership of a valid copyright and that defendant copied the protected work without authorization. *See Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 701 (2d Cir.1992); *Weissmann v. Freeman,* 868 F.2d 1313, 1320 (2d Cir.), *cert. denied,* 493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989); *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.,* 780 F.2d 189, 192 (2d Cir.1985). In the present case, the plaintiff is the undisputed owner of the registered copyright in the Moore photograph. As to the second element of copyright infringement, "[t]he plaintiff may prove defendant's copying either by direct evidence or, as is most often the case, by showing that (1) the defendant had access to the plaintiff's copyrighted work and (2) that defendant's work is substantially similar to the plaintiff's copyrightable material." *Computer Assocs. Int'l, Inc.,* 982 F.2d at 701; *see also Walker v. Time Life Films, Inc.,* 784 F.2d 44, 48 (2d Cir.), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986). The within case is that rare case where there is direct evidence—in fact, a frank admission by the defendant—that the allegedly infringing work is modelled on the copyrighted work. In the absence of a fair use defense, therefore, the defendant would be liable for infringement. *See Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 574, 114 S.Ct. 1164, 1169, 127 L.Ed.2d 500 (1994) ("[Defendant's] song would be an infringement of Acuff–Rose's rights in 'Oh, Pretty Woman,' under the Copyright Act of 1976, 17 U.S.C. § 106 (1988 ed. and Supp. IV), but for a finding of fair use through parody.")

## III. *The Nielsen Ad Is a Parody and a Fair Use of the Moore Photograph*

The purpose of copyright law is set forth in the United States Constitution, Art. I, § 8, cl. 8: "[t]o promote the Progress of Science and useful Arts ..." Lawmakers and judges generally adhered to the view that the optimal means to encourage the production of creative works was to secure to their creators the exclusive entitlement to resulting financial rewards. Nonetheless, the courts recognized that in some instances the monopoly conferred by copyright protection could limit, rather than expand, the public's access to creative works; copyright would thereby defeat its own purposes. To counteract this potential problem, American courts adopted the doctrine of "fair use." In *Folsom v. Marsh,* Justice Story explained that the doctrine classified certain uses as non-infringing by "look[ing] to the nature and objects of the selections made, the quantity and value of the. materials used, and the degree in which the use may prejudice the sale, or diminish the profits, or supersede the objects, of the original work." 9 F.Cas. 342, 348 (No. 4,901) (CCD Mass.1841). This judge-made fair use analysis thus balanced the public interest in access to works building on the foundation laid by earlier copyrighted works against the protection of the author's monetary incentive to create.

The Copyright Act of 1976 clearly derived its codification of a statutory fair use defense from Justice Story's formulation. Section 107 provides:

§ 107. Limitations on exclusive rights: fair use. Notwithstanding the provisions of § 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research is not an infringement of copyright. In determining whether the use made of a work in a particular case is a fair use the factors to be considered shall include:

(a) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(b) the nature of the copyrighted work;

(c) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(d) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107 (1988 ed. and Supp. IV). Congress intended § 107 to preserve the existing doctrine, "not to change, narrow, or enlarge it in any way." H.R.Rep. No. 94–1476, p. 66 (1976); S.Rep. No. 94–473, p. 62 (1975), U.S.Code Cong. & Admin.News 1976, pp. 5659, 5679. The fair use analysis "permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Stewart v. Abend,* 495 U.S. 207, 236, 110 S.Ct. 1750, 1768, 109 L.Ed.2d 184 (1990) (internal citations and quotation marks omitted).

The Supreme Court has acknowledged that § 107 calls for a "case-by-case analysis." *Campbell,* 510 U.S. at 577, 114 S.Ct. at 1170. Moreover, within each case, courts are not to apply the four-part test as a rigid formula; the factors listed are nonexclusive and must be considered as integrated parts of a flexible examination. *Harper & Row v. Nation Enterprises,* 471 U.S. 539, 560, 105 S.Ct. 2218, 2230, 85 L.Ed.2d 588 (1985). Ultimately, the fair use defense requires a sensitive balancing of inherently antagonistic interests in order to secure public access to the greatest number of creative works. The flexibility that must be the hallmark of the fair use defense, however, has the unfortunate side effect of making the application of the defense to this particular case a complex and daunting task.

## A. *The Purpose and Character of the Use*

■ The first of the fair use factors directs my attention to the allegedly infringing work and requires an examination of two aspects, the character and the purpose, of that work. Prior to 1994, analysis of this element focused almost exclusively on the purpose of the use; courts emphasized that "every commercial use [was] presumptively ... unfair." *Acuff–Rose v. Campbell,* 972 F.2d 1429, 1439 (6th Cir.1992) (citing *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 451, 104 S.Ct. 774, 793, 78 L.Ed.2d 574 (1984)), *rev'd,* 510 U.S. 569, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994). This presumption often tipped the scales of the fair use inquiry at the expense of the underlying principles of flexibility and individualized analysis. Although it has been roundly rejected by the Supreme Court, this approach did have one undeniable benefit: it substantially simplified the fair use analysis, since a finding of commercial purpose rendered the other factors negligible and virtually compelled the conclusion that the use was unfair.

The Supreme Court dispelled this inflexibility—and any accompanying simplicity—in *Campbell v. Acuff–Rose,* 510 U.S. 569, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994). In *Campbell,* the Court held that the Sixth Circuit had placed undue weight on the commercial nature of the allegedly infringing use in its determination that the use was unfair. The Court noted that any hard evidentiary presumption would run counter to the long common-law tradition of fair use adjudication and would contradict the statute's clear indication that a work's commercial nature is only one element of the first factor inquiry into its character and purpose.

In *Campbell,* the Supreme Court faced a commercial parody that was asserted to be a fair use; the parallels to the present case are obvious. The plaintiff owned the rights to the Roy Orbison song, "Oh, Pretty Woman." The defendants Campbell *et al.,* who were better known by their collective appellation, 2 Live Crew, had written a rap song of the same title which drew heavily on the Orbison song but substituted shocking lyrics for the sweet, not to say syrupy, words of the Orbison composition. The defendants had applied for permission to use the Orbison song; after being refused permission, they nonetheless recorded and released the rap version.

Defendants argued that their use was a parody of the "banal" original and a fair use; the district court agreed based on its analysis of the four fair use factors. The Sixth Circuit reversed on the grounds that the district court had "refused to indulge the presumption" that all commercial uses are unfair. The Supreme Court granted certiorari and reversed the Court of Appeals, holding that no such presumption was warranted.

As to the first fair use factor, the Court held that the critical inquiry entailed whether the second work "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.'" *Campbell*, 510 U.S. at 579, 114 S.Ct. at 1171. The Court went on to state, "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id.*

With respect to parody, the Court concluded:

> Parody has an obvious claim to transformative value, as Acuff–Rose itself does not deny. Like less ostensibly humorous forms of criticism, it can provide social benefit, by shedding light on an earlier work and, in the process, creating a new one ... [T]hus, ... parody, like other comment or criticism, may claim fair use under § 107.

*Id.; see also Fisher v. Dees*, 794 F.2d 432 (9th Cir.1986) (finding a parody entitled "When Sonny Sniffs Glue" to be a fair use of the song, "When Sunny Gets Blue"); *Elsmere Music, Inc. v. National Broadcasting Co.*, 482 F.Supp. 741 (S.D.N.Y.), *aff'd*, 623 F.2d 252 (2d Cir.1980) (finding "I Love Sodom," a Saturday Night Live parody, to be a fair use of "I Love New York").

To qualify as a parody under the Court's definition, however, the second work must comment upon or criticize the original copyrighted work. The Court distinguished parody from satire in this regard: "Parody needs to mimic an original to make its point, and so has some claim to use the creation of its victim's (or its collective victims') imagination, whereas satire can stand on its own two feet and so requires justification for the very act of borrowing." *Campbell*, 510 U.S. at 580–81, 114 S.Ct. at 1172. A work that lacks this direct reference to the copyrighted work is not a parody, and is likely to fail as a fair use:

> If, on the contrary, the commentary has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger.

*Id.; see also Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 924 F.Supp. 1559, 1567–68 (S.D.Cal.1996) (comparing satire and parody and·indicating that a satirist has less justification for copying an original than a parodist). The plaintiff in this case claims that the Nielsen advertisement does not constitute a parody of the Moore photograph because it does not comment upon or criticize the Moore photograph and that, as a result, the first factor weighs against a finding of fair use.

Several courts have found that a work that is not referential to the copyrighted work does not qualify as a parody or a fair use. In *Steinberg v. Columbia Pictures Industries, Inc.*, 663 F.Supp. 706 (S.D.N.Y.1987), for example, the court held that a poster advertising the film "Moscow on the Hudson" that copied a famous Saul Steinberg representation of the New Yorker's myopic view of the world which had appeared on the cover of *The New Yorker* magazine was not a parody. The court relied on the fact that:

> neither the "Moscow" movie nor the poster was designed to be a parody of the Steinberg illustration. The poster merely borrowed numerous elements from Steinberg to create an appealing advertisement to promote an unrelated commercial product, the movie. No parody of the illustration is involved, and defendants are not entitled to the protection of the parody branch of the fair use doctrine.

*Id.* at 715. Similarly, in *MCA, Inc. v. Wilson*, 677 F.2d 180 (2d Cir.1981), the Second Circuit rejected the fair use defense raised by the composers of "Cunnilingus Champion of Company C," which infringed the plaintiff's copyright in "Boogie Woogie Bugle Boy of Company B." In that case, defendants conceded that their song satirized the mores of society rather than lampooned the well-known Andrews Sisters song. In light of that admission, the court concluded:

We are not prepared to hold that a commercial composer can plagiarize a competitor's copyrighted song, substitute dirty lyrics of his own, perform it for commercial gain, and then escape liability by calling the end result a parody or satire on the mores of society.

*Id.* at 185; *see also United Feature Syndicate, Inc. v. Koons,* 817 F.Supp. 370, 384 (S.D.N.Y.1993) (rejecting fair use defense of an artist who admitted that his sculpture parodied "the banality of life" rather than the characteristics of Odie, the cartoon character it copied); *Rogers v. Koons,* 960 F.2d 301, 305, 311 (2d Cir.), *cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992) (upholding summary judgment against the same artist who copied a postcard photograph in order to satirize conventionality in general, noting that "it is not really the parody flag that appellants are sailing under, but rather the flag of piracy"); *cf. Metro–Goldwyn– Mayer, Inc. v. American Honda Motor Co.,* 900 F.Supp. 1287, 1300 (1995) (denying a fair use defense where defendant argued that its commercial parodied the action film genre rather than the specific character, James Bond).

By contrast, courts have repeatedly found works that are adequately referential to the copyrighted work to be parodies. In *Fisher v. Dees,* for example, the composers of "When Sunny Gets Blue" argued that although the allegedly infringing work, "When Sonny Sniffs Glue," borrowed from the original, it was not "directed at" the original and therefore failed to qualify as a parody. *Fisher,* 794 F.2d at 432. The Ninth Circuit disagreed, stating that "we reject the notion that the song was used merely as a vehicle to achieve a comedic objective unrelated to the song, its place and time." *Id.* at 436. The court found that the defendant's version was intended to "poke fun at the composers' song, and at Mr. Mathis's rather singular vocal range." *Id.* The court went on to analyze the alleged infringement under the statutory factors and held it to be a fair use. *Id.* at 440.

Similarly, in *Elsmere Music, Inc. v. National Broadcasting Company,* the court examined a Saturday Night Live sketch in which the cast of SNL, in the characters of the mayor and members of the Chamber of Commerce of the biblical city of Sodom, are discussing their city's poor image among potential tourists. *Elsmere,* 482 F.Supp. at 743. Rather than addressing the underlying social ills, Sodom's leaders decide instead to unveil a glitzy ad campaign that recasts the city's image in a more positive light. The highlight of the campaign involves a cheery, a capella rendition of a catchy jingle, "I–I–I– I Love Sodo-o-o-m." *Id.* The creators of the New York city advertising campaign, which also relied on a catchy "I Love New York" jingle were, in the words of Queen Victoria, not amused. They sued for copyright infringement. *Id.* at 744. The plaintiffs argued, among other things, that the SNL segment parodied New York City and the problems it was having, rather than the advertising campaign or the song "I Love New York" itself, and that therefore the defendant's copying was unjustified. *Id.* The court rejected this argument, holding that the song "I Love Sodom" and the sketch of which it was a part, were "clearly an attempt by the writers and cast of SNL to satirize the way in which New York City had attempted to improve its somewhat tarnished image through the use of a slick advertising campaign ... [t]he song was as much a parody of the song, 'I Love New York,' a catchy, upbeat tune intended to alter a potential tourist's perceptions of New York, as it was of the overall 'I Love New York' advertising campaign." *Id.* at 744, 746. The court went on to hold that SNL's use of the "heart" of the "I Love New York" jingle was a fair one. The Court of Appeals upheld this conclusion, stating succinctly, "Believing that, in today's world of often unrelieved solemnity, copyright law should be hospitable to the humor of parody, and that the District Court correctly applied the doctrine of fair use, we affirm on Judge Goettel's thorough opinion." *Elsmere Music, Inc. v. National Broadcasting Co.,* 623 F.2d 252, 253 (2d Cir.1980) (per curiam).

In the case at bar, the Nielsen ad clearly takes satiric aim directly at the Moore photograph. From the outset, it was intended to make a mockery of an image that had become a "cultural icon." (Ludovico Decl., ¶ 7,

Grant Decl., ¶ 6). In fact, without reference to the Moore photograph, the Nielsen ad simply is not very funny. Like all parodies, it relies for its comic effect on the contrast between the original—a serious portrayal of a beautiful woman taking great pride in the majesty of her pregnant body—and the new work—a ridiculous image of a smirking, foolish-looking pregnant man. It thus fits squarely within the definition of parody as a "literary or artistic work that imitates the characteristic style of an author or a work for comic effect or ridicule," The American Heritage Dictionary 1317 (3d ed. 1992), or a "composition . . . in which the characteristic turns of thought and phrase in an author or class of authors are imitated in such a way as to make them appear ridiculous," The Oxford English Dictionary 247 (2d ed. 1989). Because the humorous nature of the Nielsen ad depended on the unique qualities of the Moore photograph and its instant recognizability, it demonstrates the necessary "joinder of reference and ridicule" to qualify as a parody. *See Campbell*, 510 U.S. at 583, 114 S.Ct. at 1173.

Moreover, the advertisement's use of the Moore photograph was intentionally linked to issues of childbearing and pregnancy that are central to the plot of *Naked Gun 33 1–3*. In her deposition, Annie Leibovitz discussed her view that the *Vanity Fair* cover was an "important image for women who are made to feel that when they are pregnant they are supposed to hide and go off in a corner. . . ." (Deposition of Annie Leibovitz, p. 25). The Moore photograph thus came to represent a particular view of pregnancy as a source of pride and a particular form of beauty. By contrast, Leslie Nielsen's character in the film is subject to pressure from his wife to start a family and views pregnancy and fatherhood with at best ambivalence, at worst stereotypical dread. (Ludovico Decl., ¶ 4). The contradiction between these views is captured in the Nielsen ad by the contrast between Leslie Nielsen's guilty smirk and the copying of Demi Moore's forthright pose. This contradiction is part of what makes the Nielsen ad a parody.

While under the particular circumstances of this case it is appropriate for the judge to make the determination as to "whether a parodic character may reasonably be perceived," *Campbell*, 510 U.S. at 582, 114 S.Ct. at 1173, I take comfort from the fact that no one connected with this complex case has expressed a contrary opinion (other than the plaintiff's attorneys in their role as advocates). The unchallenged testimony from defendant and its advertisement agency is that from its inception, they intended the advertisement to be a parody of the Moore photograph and geared their copying to that objective. (*See* Ludovico Decl., ¶ 6; Grant Decl., ¶ 6, 9). Further, the plaintiff herself identified the Nielsen ad as a "parody" of the Moore photograph. (Deposition of Annie Leibovitz, p. 38 ("[I]t was obviously, you know, it was a parody of the picture.")). The opinions of these parties, who combine intimate familiarity with the images at issue with a degree of aesthetic expertise that I cannot claim to possess, while not dispositive, offer further support for the conclusion that the Nielsen ad is a parody of the Moore photograph.

Unfortunately, the finding that the Nielsen ad parodies the Moore photograph does not, standing alone, mean that the first factor of the fair use analysis weighs in favor of defendant. The first factor requires me to look at two issues, the character and purpose of the otherwise infringing use. In the present case, these two "ingredients" of the first element militate in favor of opposing conclusions. The Nielsen ad is, like all legitimate parodies, "transformative" in character. It is also, however, undoubtedly commercial in purpose: it was intended to pique public interest in *Naked Gun 33⅓*. In the wake of *Campbell*, this factor is not dispositive but it remains relevant and weighs against a finding of fair use.

The Supreme Court has not given the district courts much guidance in resolving a case like this one. On one hand, the Court has indicated, "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579, 114 S.Ct. at 1171. On the other hand, while clearly holding that the commercial purpose of an otherwise infring-

ing work does not automatically bar a finding of fair use, the Court also stated that "[t]he use ... of a copyrighted work to advertise a product, even in a parody, will be entitled to less indulgence under the first factor of the fair use enquiry, than the sale of a parody for its own sake...." *Id.* at 585, 114 S.Ct. at 1174. Further complicating matters, the Court does not even begin to address the wheels within wheels presented by a case like this one, where a parodic, otherwise infringing ad is used to market another creative work that is itself a satire.

I can only reconcile these disparate elements by returning to the core purpose of copyright: to foster the creation and dissemination of the greatest number of creative works. The end result of the Nielsen ad parodying the Moore photograph is that the public now has before it two works, vastly different in appeal and nature, where before there was only one. Of course, in all cases the existence of the infringing work in some sense doubles the public access to creative works. Where the second work is not highly transformative, however, the second work may not add much to the public catalogue. And, of course, where the presence of the second work disrupts the incentive of authors to create works that will be subject to piracy by infringers, the public loses access to those works that discouraged authors determine not to create. Here, however, I find that the second work is very different from the first; whether photographers like Annie Leibovitz would be discouraged from creating works like the *Vanity Fair* cover is dealt with under the fourth fair use factor. *See Campbell,* 510 U.S. at 578, 114 S.Ct. at 1170–71 ("Nor may the four statutory factors be treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright.") Under the particular circumstances of this case, I find that the purposes of copyright are best served by a finding that the highly transformative character of the Nielsen ad trumps its admittedly commercial purpose and that the first fair use factor therefore weighs in favor of the defendant, albeit perhaps by only a slight margin.

### B. The Nature of the Copyrighted Work

The second statutory factor represents an acknowledgement that certain works are closer to the heart of copyright than others; fair use is therefore more difficult to establish when a core work is copied than when an infringer takes material that falls only marginally within copyright protection. *See, e.g., Stewart v. Abend,* 495 U.S. 207, 237–38, 110 S.Ct. 1750, 1768–69, 109 L.Ed.2d 184 (1990) (contrasting a fictional short story with factual works); *Harper & Row v. The Nation,* 471 U.S. at 563–64, 105 S.Ct. at 2232–33 (contrasting forthcoming memoir with published speech); *Feist Publics. v. Rural Telephone Service Co.,* 499 U.S. 340, 348–51, 111 S.Ct. 1282, 1289–91, 113 L.Ed.2d 358 (1991) (contrasting creative works with bare factual compilations).

In the present case, there can be no doubt that the photograph created by Ms. Leibovitz is a highly creative work by an accomplished artist that falls well within the heartland of copyright protection. To quote the Supreme Court, "[t]his fact, however, is not much help in this case, or ever likely to help much in separating the fair use sheep from the infringing goats in a parody case, since parodies almost invariably copy publicly known, expressive works." *Campbell,* 510 U.S. at 586, 114 S.Ct. at 1175. I conclude, therefore, that this factor weighs in favor of the plaintiff, but assumes less importance in the fair use analysis with respect to a parody like the one at issue, relative to the other three factors.

### C. The Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole

This element of the fair use analysis examines the extent of the parodist's copying in light of its purposes to determine whether it is qualitatively and quantitatively excessive. *Id.* The Supreme Court has recognized that the extent of permissible copying varies with the purpose and character of the use. *See id.; Sony,* 464 U.S. at 449–50, 104 S.Ct. at 792 (holding that reproduction of entire work "does not have its ordinary effect of militating against a finding of fair use" as to home videotaping of television programs); *Harper*

*& Row,* 471 U.S. at 564, 105 S.Ct. at 2232 ("[E]ven substantial quotations might qualify as a fair use in a review of a published work or a news account of a speech" but not in a scoop of an as yet unpublished memoir). This factor therefore intersects both with the first factor and with the fourth fair use factor, which examines the degree to which the second work usurps the market for the copyrighted work.

The Supreme Court has stated the general rule as follows: "a work composed primarily of an original, particularly its heart, with little added or changed, is more likely to be a merely superseding use, fulfilling demand for the original." *Campbell,* 510 U.S. at 587–88, 114 S.Ct. at 1176. The application of this guideline to parody, however, is particularly difficult. As discussed above, parody depends on imitation of a recognizable original to achieve its humorous commentary. In recognition of the peculiar needs of the parodist, the *Campbell* Court joined a line of previous decisions holding that a parodist is justified in taking more of the original copyrighted work than would otherwise be permissible, even for another fair user. *See, e.g., Rogers v. Koons,* 960 F.2d at 310 ("We have consistently held that a parody entitles its creator under the fair use doctrine to more extensive use of the copied work than is ordinarily allowed...."); *Elsmere Music,* 482 F.Supp. at 744 ("[A]n author is entitled to more extensive use of another's copyrighted work in creating a parody than in creating other fictional or dramatic works."); *Berlin v. E.C. Publics., Inc.,* 329 F.2d 541, 545 (2d Cir.1964) (holding that because defendants had taken no more of the original songs than was necessary to "recall or 'conjure up' the object of his satire" and because the parody had "neither the intent nor the effect of fulfilling the demand for the original," no infringement had taken place). *Campbell* adopted this reasoning and held that "the parody must be able to "conjure up" at least enough of that original to make the object of its critical wit recognizable." *Campbell,* 510 U.S. at 588, 114 S.Ct. at 1176. The question, then, is whether the defendant in this case took more than was reasonably required to "conjure up" the Moore photograph in creating the Nielsen ad.

The plaintiff, of course, rigorously argues that the defendant took the heart of her work without any justification and offers as an alternative that "Mr. Nielsen could have, sans attire, struck a Moore-like pose with pillows strapped round his waist to simulate pregnancy." (Memorandum in Opposition to Plaintiff's Motion for Summary Judgment, p. 23). Defendant responds that the heart of the Moore photograph was its portrayal of Demi Moore's face and expression, rather than the appearance of her pregnant body. I view the Moore photograph as an integrated whole: Ms. Moore's face and body, taken together, convey a unique image of a woman who radiates unashamed sensuality and pride in her pregnancy. While I agree that defendant copied many of the most distinctive features of the Moore photograph, this determination is not dispositive in light of the Supreme Court's recognition that even a taking of the "heart" of the original does not necessarily bar a finding of fair use because "the heart is also what most readily conjures up [the work] for parody, and it is the heart at which parody takes aim." *Campbell,* 510 U.S. at 588, 114 S.Ct. at 1176. The inquiry instead is whether the defendant took more than was reasonably required to conjure up the original and bring home the point of its parody. *See Fisher,* 794 F.2d at 438 ("[T]he concept of 'conjuring up' an original came into the copyright law not as a limitation on how much of an original may be used, but as a recognition that a parody frequently needs to be more than a fleeting evocation of an original in order to make its humorous point. A parody is entitled to at least 'conjure up' the original.") (citing *Elsmere v. National Broadcasting Co.,* 623 F.2d 252, 253 n. 1 (2d Cir.1980) (per curiam)); *see also Tin Pan Apple v. Miller Brewing Co., Inc.,* 737 F.Supp. 826, 830 (S.D.N.Y.1990) ("A parody is entitled to at least 'conjure up' the original. Even more extensive use would still be fair use, provided that parody builds upon the original, using the original as a known element of modern culture and contributing something new for humorous effect or commentary.") As the Supreme Court has admonished, however, not everyone "who calls himself a parodist can skim the cream and

get away scot free ... the question of fairness asks what else the parodist did besides go to the heart of the original." *Campbell,* 510 U.S. at 589, 114 S.Ct. at 1176.

In the present case, the Nielsen ad drew heavily on the original; it closely mimicked the pose, lighting, backdrop, body configuration, and skin tone that appeared in the original. On the other hand, the Nielsen ad is in fact a photograph of a *different* pregnant woman, and of course neither Ms. Leibovitz nor anyone else holds a monopoly over the idea of a nude, pregnant woman. *See Branch v. Ogilvy & Mather, Inc.,* No. 89 Civ. 2440 (LLS), 1990 WL 74540, at *6 (S.D.N.Y. May 30, 1990) ("It is an axiom of copyright law that the protection granted to a copyrightable work extends only to the particular expression of an idea and never to the idea itself.") (internal quotation marks omitted). The addition of Leslie Nielsen's head, with its markedly different facial expression, was a significant transformative element. Moreover, I do not agree that a photo of Leslie Nielsen with a pillow strapped to his middle would be sufficiently evocative of the Moore photograph to serve defendant's parodic purpose. Perhaps the defendant could have used the pose and backdrop, but not the lighting of the original, or the pose and lighting, but not the backdrop and still achieved its purposes. I view any additional copying as slight, however, when compared with the copying that was absolutely necessary to defendant's aim: the reproduction of Ms. Moore's pose, her state of pregnancy, and her nudity. Further, I note that the unchallenged testimony of Nathan Grant supports a conclusion that the defendant calibrated the extent of its copying against its estimation of what was necessary to evoke the Moore photograph in the public mind. In his Declaration, Mr. Grant stated, "We also wanted to ensure that the audience would be certain to identify the work we were parodying." (Grant Decl., ¶ 9). Mr. Grant's deposition testimony was consistent on this point:

Q. You told Mr. Schad that the intent of making the photograph of the model was to come as close to the Demi Moore photo as possible: is that correct?

A. Yes.

Q. Why were you trying to come as close as possible?

A. Because we were trying to have the viewer make no mistake that that's who we were making a parody of. This is a parody of that shot.

(Deposition of Nathan Grant, pp. 23–24). In light of the ad's "parodic purpose and character, its transformative elements, and considerations of the potential for market substitution sketched more fully below," *Campbell,* 510 U.S. at 589, 114 S.Ct. at 1177, I find that defendant's calibration succeeded; defendant took no more of the Moore photograph than was necessary to conjure it up in the eyes of a viewer of the Nielsen ad. Because the ad took an image that had become widely known and added something distinctly new for humorous commentary, this element weighs in favor of a finding of fair use.

**D. The Effect on the Potential Market for or Value of the Copyrighted Work**

The final element of the fair use analysis examines the market harm caused by the alleged infringement, taking account "not only of harm to the original but also of harm to the market for derivative works." *Harper & Row,* 471 U.S. at 568, 105 S.Ct. at 2234. Although no single element of the fair use test is dispositive, in light of the underlying purposes of copyright, the Supreme Court has recognized that this is "undoubtedly the single most important element of fair use." *Id.* at 566, 105 S.Ct. at 2233. The centrality of this factor results not from courts according disproportionate weight to it, but from its close link to the other fair use factors, including the purpose and character of the use (*see* III.A, *supra* ) and the extent of the portion taken (*see* III.B, *supra* ).

Once again, parody as a genre occupies a different position than other assertedly fair uses, because a parodist is entitled to damage the market for an original—but only in certain ways. As the Supreme Court stated:

We do not, of course, suggest that a parody may not harm the market at all, but when a lethal parody, like a scathing theater review, kills demand for the original, it does not produce a harm cognizable under the Copyright Act. Because "paro-

dy may quite legitimately aim at garroting the original, destroying it commercially as well as artistically," B. Kaplan, An Unhurried View of Copyright 69 (1967), the role of the courts is to distinguish between "[b]iting criticism [that merely] suppresses demand [and] copyright infringement, [which] usurps it." *Fisher v. Dees,* 794 F.2d at 438. *Campbell,* 510 U.S. at 591–92, 114 S.Ct. at 1178. This principle recognizes that although derivative markets are an appropriate consideration in a fair use analysis, there is no protectable derivative market for criticism. *Id.* Courts have been realistic in acknowledging the "unlikelihood that the creators of imaginative works will license critical reviews or lampoons of their own productions." *Id.*

Because parody must be a transformative use, a parody is unlikely to serve as a market substitute for the original. *See id.* at 591, 114 S.Ct. at 1177 ("[I]t is more likely that the new work will not affect the market for the original in any way cognizable under this factor, that is, by acting as a substitute for it (superseding its objects). This is so because the parody and the original usually serve different market functions.") (internal quotation marks and citations omitted).

Numerous courts have relied on this recognition that separate markets exist in concluding that a parody inflicted no harm on the market for a particular original. For example, in *Fisher v. Dees,* 794 F.2d at 438, the Ninth Circuit held that demand for the song, "When Sunny Gets Blue," a nostalgic reminiscence about lost love, was not supplanted by the parody "When Sonny Sniffs Glue," a song describing the physical aftermath of glue-sniffing. Similarly, in *Eveready Battery Co. v. Adolph Coors Co.,* 765 F.Supp. 440, 448 (N.D.Ill.1991), the court held that a beer commercial that parodied a battery commercial did not usurp the market for the first commercial. *See also Elsmere Music, Inc. v. National Broadcasting Co.,* 482 F.Supp. 741, 747 (S.D.N.Y.), *aff'd,* 623 F.2d 252 (2d Cir. 1980) (finding that the song, "I Love Sodom," did not have an impermissible market effect on the demand for the song, "I Love New York.").

In the present case, plaintiff admits that she has noticed no adverse effect on the sale or licensing of the Moore photograph after publication of the Nielsen ad. (Deposition of Annie Leibovitz, p. 57; Deposition of Jeffrey D. Smith, pp. 65–66; Deposition of James M. Moffat, pp. 53–54). This is not surprising in light of the unlikelihood that a consumer who was in the market for an image such as the Moore photograph—a serious comment on a woman's fulfillment in her pregnancy—would have his or her demand satisfied by a slapstick parody such as the Nielsen advertisement. Because market substitution is the only cognizable harm under the Copyright Act and there is no derivative market for critical works, this final element also weighs in favor of a finding of fair use.

## CONCLUSION

The fair use doctrine has been described as a "guarantee of breathing space at the heart of copyright." *Campbell,* 510 U.S. at 579, 114 S.Ct. at 1171. This breathing space ensures that copyright will not stifle the very proliferation of creative works that it was designed to foster. Three of the four fair use factors in the present case militate in favor of a finding of fair use, largely because the defendant's transformation of the plaintiff's photograph has resulted in public access to two distinct works, serving distinct markets, with little risk that the creator of the first work will be disinclined to create further works that may be open to parody. Because I agree with the Second Circuit that in this case "[a]ccording [the] proprietor [of the copyrighted work] further protection against parody does little to promote creativity, but it places a substantial inhibition upon the creativity of authors adept at using parody, ..." I hold that the fundamental purposes of copyright are best served by a finding that defendant's use of the Moore photograph is a fair one. *Warner Bros., Inc. v. American Broadcasting Companies, Inc.,* 720 F.2d 231, 242 (2d Cir.1983). Accordingly, defendant's motion for summary judgment is granted and plaintiff's motion for summary judgment is denied.

SO ORDERED.