**Annie LEIBOVITZ, Plaintiff–Appellant,**

v.

**PARAMOUNT PICTURES CORPORATION, Defendant–Appellee.**

**Docket No. 97–7063.**

United States Court of Appeals, Second Circuit.

Argued Oct. 20, 1997.

Decided Feb. 19, 1998.

---

110

Tennyson Schad, Norwick & Schad, New York City, for plaintiff-appellant.

Jonathan Zavin, New York City (Jacques M. Rimokh, Richards & O'Neil, New York City, on the brief), for defendant-appellee.

Before: NEWMAN, CALABRESI, and CUDAHY,* Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal concerns the fair use defense to copyright infringement in the context of an advertisement claimed to be a parody of a copyrighted photograph. Annie Leibovitz appeals from the December 20, 1996, judgment of the District Court for the Southern District of New York (Loretta A. Preska, Judge), granting summary judgment for defendant-appellee Paramount Pictures Corp. ("Paramount"). *Leibovitz v. Paramount Pictures Corp.*, 948 F.Supp. 1214 (S.D.N.Y. 1996). Leibovitz argues that she, not the defendant, was entitled to summary judgment, principally on the ground that the defendant's use was commercial and therefore should receive little protection under the fair use defense. While we agree that the commercial nature of Paramount's advertisement weighs against it in the fair use balance, we nonetheless conclude that this advertisement qualifies as a parody entitled to the fair use defense under the analysis set forth by the Supreme Court in *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994). Accordingly, we affirm.

* The Honorable Richard D. Cudahy of the United States Court of Appeals for the Seventh Circuit, sitting by designation.

## Background

Leibovitz is a well known and widely published photographer. Among her most recognizable works is the photograph alleged to be infringed in this case, the photograph of the actress Demi Moore that appeared on the cover of the August 1991 issue of *Vanity Fair* magazine. Moore, who was pregnant at the time, was depicted nude, in profile, with her right hand and arm covering her breasts and her left hand supporting her distended stomach—a well known pose evocative of Botticelli's *Birth of Venus.*[1] A ring adorns the middle finger of Moore's right hand. Moore's facial expression is serious, without a trace of a smile. The appearance of the photograph attracted widespread attention, and that issue became one of *Vanity Fair*'s best selling issues of all time.

In August 1993, Paramount solicited advertising ideas from an outside advertising agency, Dazu, Inc. ("Dazu"), in connection with its forthcoming release of the motion picture *Naked Gun 33 1/3: The Final Insult.* This film was the third in a series of slapstick comedies starring the actor Leslie Nielsen as the maladroit detective Frank Drebin. One minor theme of the film was a controversy between Drebin and his wife as to whether to conceive a child and Drebin's subsequent treatment at a fertility clinic. There is no evidence, however, that Paramount informed Dazu of this theme, or that Paramount planned the advertising campaign to relate to any aspect of the movie's plot.

Paramount asked Dazu to come up with ideas for a "teaser" advertising campaign, to be launched in advance of the March 1994 release date of the film. In response, Dazu suggested that the teasers superimpose Nielsen's face on readily recognizable photographs of famous women. Dazu forwarded to Paramount copies of four composite photographs, each superimposing Nielsen's face in place of what had been the faces of the actresses Sharon Stone, Madonna, Jane Fonda, and Demi Moore. Each proposed teaser included a slogan referring to the March release date of the film. The composite photograph depicting Nielsen as the pregnant Moore slyly proclaimed, "DUE THIS MARCH."

Paramount approved the concept, and selected the composite of Moore's body and Nielsen's face. However, rather than mechanically copying the portion of the original Leibovitz photograph depicting Moore's body, Paramount commissioned another photograph to be taken of a nude, pregnant woman, similarly posed. Great effort was made to ensure that the photograph resembled in meticulous detail the one taken by Leibovitz. The model was carefully posed so that her posture and hands precisely matched those of Moore in the Leibovitz photograph. A large ring was placed on the same finger as the one appearing on Moore's hand.[2] The photograph was digitally en-

1. The pose of a nude female with one arm sometimes fully or partially covering the breasts and the other arm covering the pubic area is known in classical art as "Venus Pudica." *See* James Hall, *Dictionary of Subjects and Symbols in Art* 318–19 (1974). "The first and greatest artistic embodiment of the Venus Pudica was the *Aphrodite* of Knidos (Cnidus) by Praxiteles. After nearly a thousand years in disuse, the pose reappeared in the late Middle Ages, in classicizing imitation—first in the figure of Eve after the Fall, and later in female allegorical figures and depictions of Venus. Since from the 12th through the 15th century the pose was understood merely as a gesture of modesty, it was used also for the figure of Adam after the Fall." Eugenio Battisti, *Visualization and Representation of the Figure, in* VII *Encyclopedia of World Art* 665, 669 (1963). An example of the Venus Pudica pose assumed by both a male and a female figure is Van Eyck's diptych of Adam and Eve in the Ghent Cathedral. *See* Edwin Mullins, *The Painted Witch—Female Body: Male Art* 29 (1985).

Hall translates "Venus Pudica" as "Venus of Modesty," Hall, *supra*, at 319, although the more literal translation of the noun and adjective would be "modest Venus." Mullins contends that Van Eyck's figure of Eve feels guilty about being pregnant, *see* Mullins, *supra*, at 29, justifying an alternate meaning of "pudica" as "ashamed." The phrase is sometimes rendered "Venus Pudens" using the present participle to mean either "being modest" or "being ashamed."

In Botticelli's version, displayed in the Uffizi Gallery, Venus, having just been born, is presumably not pregnant, although her stomach is slightly distended. In Van Eyck's diptych of Adam and Eve, Eve is said to be pregnant. *See id.*

2. The ring in the Leibovitz photograph shows a craftsmanship and sparkle that make it appear elegant. The ring in the Paramount photograph sports what seems to be a large piece of glass in

hanced by a computer to make the skin tone and shape of the body more closely match those of Moore in the Leibovitz photograph. The final step was to superimpose on the model's body a photograph of Nielsen's face, with his jaw and eyes positioned roughly at the same angle as Moore's, but with her serious look replaced by Nielsen's mischievous smirk.

Paramount ran its teaser in a magazine ad campaign in early 1994. Leibovitz protested the use, and ultimately brought this action in District Court. On cross-motions for summary judgment, the District Court granted Paramount's motion, ruling that the undisputed facts demonstrated that Paramount was entitled to the defense of fair use.

### Discussion

Leibovitz contends that the District Court erred in granting Paramount's motion for summary judgment and should have granted partial summary judgment, as to liability, in her favor. Both parties agree that no factual issues remain in dispute; they disagree only on the availability of the fair use defense to what appears to be an acknowledged prima facie case of copyright infringement. Paramount argues that its work is a parody, and should be evaluated under the standards set forth in *Campbell* for determining whether parodic uses are "fair." Leibovitz responds that even if the advertisement is appropriately considered a parody of her photograph, it should fail the fair use test because it was employed for commercial purposes and because it replicated more of her original than was necessary.

### I. Fair Use and Parody

■ The fair use doctrine "permits other people to use copyrighted material without the owner's consent in a reasonable manner for certain purposes." *Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir.1992). Recognized at common law, *see e.g., Folsom v. Marsh*, 9 F. Cas. 342 (C.C.D.Mass.1841) (Story, J.), the doctrine is now codified in section 107 of the 1976 Copyright Act, 17 U.S.C. § 107 (1994). Section 107 provides an illustrative list of the purposes for which the doctrine may be in-

voked, including "comment" and "criticism," *id.*, as well as a now familiar list of factors that courts should consider in determining whether a use is "fair." These factors are (1) the purpose and character of the use, (2) the nature of the copyrighted work, (3) the amount and substantiality of the work used, and (4) the effect of the use on the market for the original. *See id.*

Although the statute does not specifically list "parodies" among the categories of potentially "fair" uses, we have long afforded such works some measure of protection under this doctrine, *see, e.g., MCA, Inc. v. Wilson*, 677 F.2d 180 (2d Cir.1981); *Elsmere Music, Inc. v. National Broadcasting Co.*, 623 F.2d 252 (2d Cir.1980); *Berlin v. E.C. Publications, Inc.*, 329 F.2d 541 (2d Cir. 1964), and the Supreme Court authoritatively confirmed the applicability of the fair use doctrine to parodies in *Campbell*, 510 U.S. at 579, 114 S.Ct. at 1171.

### II. *Campbell*'s Clarification of the Fair Use Defense

*Campbell* clarified the fair use defense in general and its particular application to parodies. As a general matter, the Court emphasized that the fair use determination "calls for case-by-case analysis," *id.* at 577, 114 S.Ct. at 1170, and "is not to be simplified with bright-line rules," *id.* The Court made clear that all four of the statutory factors "are to be explored, and the results weighed together." *Id.* at 578, 114 S.Ct. at 1171.

*Campbell* also significantly illuminated the proper application of the first fair use factor, the purpose and character of the use. The focus of this inquiry, the Court explained, should be on whether the copying work "merely 'supersede[s] the objects' of the original . . . , or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message," *id.* at 579, 114 S.Ct. at 1171 (quoting *Folsom*, 9 F. Cas. at 348) (citations omitted; brackets in original). The Court considered this standard appropriately captured by Judge Leval's helpful adjective "transformative." *Id.* (quoting Pierre N. Le-

place of a jewel, for an effect that appears delib-    erately to fall short of elegance.

val, *Toward a Fair Use Standard,* 103 Harv. L.Rev. 1105, 1111 (1990)).

In focusing the first factor inquiry upon the "transformative" nature of the use, the Court abandoned the statement in *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), that "every commercial use of copyrighted material is presumptively ... unfair," *id.* at 451, 104 S.Ct. at 793. *See Campbell,* 510 U.S. at 583–85, 114 S.Ct. at 1173–74. Instead, the Court recalled its statement in *Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985), that commercial use is only " 'a separate factor that tends to weigh against a finding of fair use.' " *Campbell,* 510 U.S. at 585, 114 S.Ct. at 1174 (quoting *Harper & Row,* 471 U.S. at 562, 105 S.Ct. at 2231). The Court noted, however, that "the force of that tendency will vary with the context," *id.,* and that the use of a copyrighted work to advertise a product is a context entitling the copying work to "less indulgence" than if it is marketed for its own worth, *see id.*

The Court's emphasis on an aggregate weighing of all four fair use factors represented a modification of the Court's earlier view that the fourth factor, effect on the potential market for, or value of, the original, was "the single most important element of fair use." *Harper & Row,* 471 U.S. at 566, 105 S.Ct. at 2233, a characterization conspicuously absent from the *Campbell* opinion. *See American Geophysical Union v. Texaco Inc.,* 60 F.3d 913, 926 (2d Cir.1995). Rather than accord the fourth factor primacy, the Court explicitly noted that "the importance of this factor will vary, not only with the amount of harm, but also with the relative strength of the showing on the other factors." *Campbell,* 510 U.S. at 590 n. 21, 114 S.Ct. at 1176 n. 21.

### III. Campbell's Clarification of the Fair Use Defense for Parodies

Focusing particularly on the fair use protection to which parodies are entitled, the Court initially noted that "parody may or may not be fair use," *id.* at 581, 114 S.Ct. at 1172, and "like any other use, has to work its

way through the relevant factors, and be judged case by case, in light of the ends of the copyright law," *id.* Specifically relating its first-factor analysis to parodies, the Court stated, "[T]he heart of any parodist's claim to quote from existing material[ ] is the use of some elements of a prior author's composition to create a new one that, at least in part, *comments on that author's works.*" *Id.* at 580, 114 S.Ct. at 1172 (emphasis added). The comment must have some "critical bearing on the substance or style of the original composition." *Id.* The Court cautioned that the quality of the parody is not to be evaluated. *See id.* at 582, 114 S.Ct. at 1173. The relevant inquiry is "whether a parodic character may reasonably be perceived." *Id.* A permissible aspect of the inquiry, the Court noted, is "whether the parodic element is slight or great, and the copying small or extensive in relation to the parodic element, for a work with slight parodic element and extensive copying will be more likely to merely 'supersede the objects' of the original." *Id.* at 582 n. 16, 114 S.Ct. at 1173 n. 16. *Campbell* deemed an adequately parodic element present in 2 Live Crew's parody of the song "Oh, Pretty Woman" because the contrast between the copying work and the original "can be taken as a comment on the naiveté of the original of an earlier day, as a rejection of its sentiment that ignores the ugliness of street life and the debasement that it signifies." *Id.* at 583, 114 S.Ct. at 1173.

With respect to the second factor, the nature of the copyrighted work, the Court observed that the fact that the original is a creative work "within the core of the copyright's protective purposes ... is not much help in this case, or ever likely to help much in separating the fair use sheep from the infringing goats in a parody case, since parodies almost invariably copy publicly known, expressive works." *Id.* at 586, 114 S.Ct. at 1175 (citations omitted).

Turning to the third factor, the amount and substantiality of the portion used in relation to the copyrighted work as a whole, the Court acknowledged that "[p]arody presents a difficult case," *id.* at 588, 114 S.Ct. at 1175, because "[p]arody's humor, or in any event

its comment, necessarily springs from recognizable allusion to its object through distorted imitation,". *id.* That observation led the Court to make three significant points concerning third-factor analysis. First, consideration must be given not only to the quantity of the materials taken but also to "their quality and importance" to the original work. *Id.* at 587, 114 S.Ct. at 1175. Second, "the parody must be able to 'conjure up' *at least* enough of the original to make the object of its critical wit recognizable." *Id.* at 588, 114 S.Ct. at 1176 (emphasis added). In thus departing from prior decisions indicating that a parody entitled to the fair use defense could take *no more than* an amount sufficient to "conjure up" the original, *see Walt Disney Productions v. Air Pirates,* 581 F.2d 751, 757–58 (9th Cir.1978); *Columbia Pictures Corp. v. National Broadcasting Co.,* 137 F.Supp. 348, 350 (S.D.Cal.1955); *see also Berlin v. E.C. Publications, Inc.,* 329 F.2d 541, 545 (2d Cir.1964) (no infringement where parodist copied no more than necessary to "conjure up" original), *Campbell* explicitly cited our use of the "at least" formulation in *Elsmere Music,* 623 F.2d at 253 n. 1. *See Campbell,* 510 U.S. at 588, 114 S.Ct. at 1176. Third, the Court explained that "[o]nce enough has been taken to assure identification, how much more is reasonable will depend, say, on the extent to which the [copying work's] overriding purpose and character is to parody the original or, in contrast, the likelihood that the parody may serve as a market substitute for the original." *Id.*

With respect to the fourth factor, effect upon the potential market for or value of the original, the Court explicitly rejected any presumption of market harm to the original from copying "involving something beyond mere duplication for commercial purposes." *Id.* at 591, 114 S.Ct. at 1177. On the contrary, the Court observed, "as to parody pure and simple, it is more likely that the new work will not affect the market for the original in a way cognizable under this factor ... because the parody and the original usually serve different market functions." *Id.* (citations omitted). The Court also noted that harm to the original resulting from the "lethal" nature of the parody is not "a harm

cognizable under the Copyright Act." *Id.* at 591–92, 114 S.Ct. at 1178. Finally, the Court recognized that even though a parody might not inflict cognizable market harm by its adverse comment on the original, such harm might arise if the parody serves as a market substitute for a derivative work based on the original. *See id.* 592–94, 114 S.Ct. at 1178–79.

## IV. Application of *Campbell* to Paramount's Advertisement

A. *First factor.* Applying *Campbell* to the first-factor analysis, we inquire whether Paramount's advertisement "may reasonably be perceived," *id.* at 582, 114 S.Ct. at 1173, as a new work that "at least in part, comments on" Leibovitz's photograph, *id.* at 580, 114 S.Ct. at 1172. Plainly, the ad adds something new and qualifies as a "transformative" work. Whether it "comments" on the original is a somewhat closer question. Because the smirking face of Nielsen contrasts so strikingly with the serious expression on the face of Moore, the ad may reasonably be perceived as commenting on the seriousness, even the pretentiousness, of the original. The contrast achieves the effect of ridicule that the Court recognized in *Campbell* would serve as a sufficient "comment" to tip the first factor in a parodist's favor. *See id.* at 583, 114 S.Ct. at 1173 ("It is this joinder of reference and ridicule that marks off the author's choice of parody from the other types of comment and criticism that traditionally have had a claim to fair use protection as transformative works.") (footnote omitted).

In saying this, however, we have some concern about the ease with which every purported parodist could win on the first factor simply by pointing out some feature that contrasts with the original. Being different from an original does not inevitably "comment" on the original. Nevertheless, the ad is not merely different; it differs in a way that may reasonably be perceived as commenting, through ridicule, on what a viewer might reasonably think is the undue self-importance conveyed by the subject of the Leibovitz photograph. A photographer posing a well known actress in a manner that

calls to mind a well known painting must expect, or at least tolerate, a parodist's deflating ridicule.[3]

Apart from ridiculing pretentiousness, the ad might also be reasonably perceived as interpreting the Leibovitz photograph to extol the beauty of the pregnant female body,[4] and, rather unchivalrously, to express disagreement with this message. The District Court thought such a comment was reasonably to be perceived from the contrast between "a serious portrayal of a beautiful woman taking great pride in the majesty of her pregnant body ... [and] a ridiculous image of a smirking, foolish-looking pregnant man." *Leibovitz*, 948 F.Supp. at 1222.

The fact that the ad makes a parodic comment on the original does not end the first-factor analysis, however, because the ad was created and displayed to promote a commercial product, the film. This advertising use lessens the "indulgence" to which the parodic ad is entitled. *See Campbell*, 510 U.S. at 585, 114 S.Ct. at 1174. Paramount seeks to mitigate the negative force of the advertising purpose by arguing that the advertisement should be viewed as an extension of the film, rather than merely an advertisement for it. Paramount emphasizes the general jocular nature of the film, as well as the film's specific humorous treatment of pregnancy and parenthood.

Though the advertising purpose of a parodic copying should not be entirely discounted simply because the ad promotes a humorous work, there is some slight force to

Paramount's argument. For those who see the movie, the parodic comment of the ad might reasonably be perceived as reenforced by the kidding comments of the movie concerning pregnancy and parenthood.

On balance, the strong parodic nature of the ad tips the first factor significantly toward fair use, even after making some discount for the fact that it promotes a commercial product. "[L]ess indulgence," *id.* at 585, 114 S.Ct. at 1174, does not mean no indulgence at all. This is not a case like *Steinberg v. Columbia Pictures Industries, Inc.*, 663 F.Supp. 706 (S.D.N.Y.1987), where a copyrighted drawing was appropriated solely to advertise a movie, without any pretense of making a comment upon the original, *see id.* at 715.

B. *Second Factor.* Though Paramount concedes the obvious point that Leibovitz's photograph exhibited significant creative expression, *Campbell* instructs that the creative nature of an original will normally not provide much help in determining whether a parody of the original is fair use. *Campbell*, 510 U.S. at 586, 114 S.Ct. at 1175. The second factor therefore favors Leibovitz, but the weight attributed to it in this case is slight.

C. *Third Factor.* In assessing the amount and substantiality of the portion used, we must focus only on the protected elements of the original. Leibovitz is entitled to no protection for the appearance in her photograph of the body of a nude, preg-

---

**3.** Some have suggested that copyright law should accord fair use protection to parodies only when they offer commentary that is disparaging of the original. *See* Richard Posner, *When is Parody Fair Use?*, 21 J. Leg. Stud. 67, 71, 73–75 (1992); Wendy J. Gordon, *Fair Use as Market Failure: A Structural and Economic Analysis of the Betamax Case and its Predecessors*, 82 Colum. L.Rev. 1600, 1632–35 (1982). This theory begins with the proposition that creators of derivative works generally must receive permission—and pay a licensing fee—in order to use the original work. According to these theorists, parody deserves protection precisely because makers of an original work will be unwilling to license derivative uses that damage the public reputation of originals through negative criticism. Because the social good is served by increasing the supply of criticism—and thus, potentially, of truth—creators of original works cannot be given the pow-

er to block the dissemination of critical derivative works.

While we agree that the fair use defense can play a valuable role in allowing commentary with criticizing messages to see the light of day, the fair use doctrine is broad enough to protect even those commentaries that are not so damaging that the original author would refuse to license them for a fee. A parodist need not demonstrate that the copyright owner would prohibit the use in order to qualify the copy as fair use under *Campbell*.

**4.** Although Leibovitz declined at her deposition to identify a single message that her photograph conveyed, she acknowledged that among them was Moore's "self-confidence or feeling of pride in being beautiful and pregnant." Joint Appendix at 30.

nant female. Only the photographer's particular expression of such a body is entitled to protection. Thus, to whatever extent Leibovitz is contending that the ad takes the "heart" of the original, see *Harper & Row,* 471 U.S. at 564–66, 105 S.Ct. at 2232–34, she must limit her contention to the particular way the body of Moore is portrayed, rather than the fact that the ad copies the appearance of a nude, pregnant body. Moreover, in the context of parodies, "the heart is also what most readily conjures up the [original] for parody, and it is the heart at which parody takes aim," *Campbell,* 510 U.S. at 588, 114 S.Ct. at 1176. Thus, the third-factor inquiry in the parody context concerns "what else the parodist did *besides* go to the heart of the original." *Id.* at 589, 114 S.Ct. at 1176 (emphasis added).

Paramount went to great lengths to have its ad copy protectable aspects of the Leibovitz photograph. Even though the basic pose of a nude, pregnant body and the position of the hands, if ever protectable, were placed into the public domain by painters and sculptors long before Botticelli,[5] Leibovitz is entitled to protection for such artistic elements as the particular lighting, the resulting skin tone of the subject, and the camera angle that she selected. *See Rogers,* 960 F.2d at 307 ("Elements of originality in a photograph may include posing the subjects, lighting, angle, selection of film and camera, evoking the desired expression, and almost any other variant involved."); *Gentieu v. John Muller & Co.,* 712 F.Supp. 740, 742 (W.D.Mo.1989)

(protectable elements include "photographer's selection of background, lights, shading, positioning and timing").

The copying of these elements, carried out to an extreme degree by the technique of digital computer enhancement, took more of the Leibovitz photograph than was minimally necessary to conjure it up, but *Campbell* instructs that a parodist's copying of more of an original than is necessary to conjure it up will not necessarily tip the third factor against fair use. *Campbell,* 510 U.S. at 588, 114 S.Ct. at 1176. On the contrary, "[o]nce enough has been taken to assure identification," *id.,* as plainly occurred here, the reasonableness of taking additional aspects of the original depends on the extent to which the "overriding purpose and character" of the copy "is to parody the original," *id.,* and "the likelihood that the parody may serve as a market substitute for the original," *id.* That approach leaves the third factor with little, if any, weight against fair use so long as the first and fourth factors favor the parodist. Since those factors favor fair use in this case, the third factor does not help Leibovitz, even though the degree of copying of protectable elements was extensive.

D. *Fourth Factor.* Leibovitz all but concedes that the Paramount photograph did not interfere with any potential market for her photograph or for derivative works based upon it.[6] She appears to have conceded as much in her deposition testimony, as well. *See* Joint Appendix at 35.[7] Her only argu-

---

**5.** *See* note 1, *supra.* A very early example of the sculpted figure of a nude, pregnant female is " 'Venus' of Willendorf" in the Naturhistoriches Museum, Vienna, dated circa 25,000–20,000 B.C. *See* Anthony F. Janson, *History of Art* 52 (5th ed.1995). A contemporary example of the profile of a sculpted nude, pregnant female with her hands supporting her distended stomach is Isabel McIlvain's 1981 "Venus" in the Robert Schoelkopf Gallery, New York City. *See* Barry Nemett, *images objects and ideas—Viewing the Visual Arts* 8 (1992).

**6.** In *Campbell,* the fact that the song parody of "Oh, Pretty Woman" was in the genre of rap music precluded a grant of summary judgment for the defendant, in the absence of any evidence of the likely effect of the parody on the market for a nonparody rap version of the song. *See Campbell,* 510 U.S. at 593–94, 114 S.Ct. at 1178–79. In this case, Leibovitz has not identified any

market for a derivative work that might be harmed by the Paramount ad. In these circumstances, the defendant had no obligation to present evidence showing lack of harm in a market for derivative works.

**7.** Unlike her arguments to this Court, Leibovitz seemed preoccupied in her deposition testimony with the effect that the parody could have on her "special relationships" with the celebrities whom she has made a living photographing. *See* Joint Appendix at 28, 32–33. But like market harm caused by a negative book review, *see Campbell,* 510 U.S. at 591–92, 114 S.Ct. at 1177–78; *Fisher v. Dees,* 794 F.2d 432, 437–38 (9th Cir.1986), any lost revenue Leibovitz might experience due to celebrities' reluctance to be photographed for fear of enduring parodies is not cognizable harm under the fourth fair use factor. The possibility of criticism or comment—whether or not parod-

ment for actual market harm is that the defendant has deprived her of a licensing fee by using the work as an advertisement. *See* Brief for Plaintiff–Appellant at 44. But she is not entitled to a licensing fee for a work that otherwise qualifies for the fair use defense as a parody. *See Campbell*, 510 U.S. at 592, 114 S.Ct. at 1178. The fourth factor favors the defendant.

E. *Aggregate Assessment.* The aggregate assessment necessary for an ultimate decision might be difficult in some cases if the relevant factors weighed heavily on opposite sides of the balance. However, in light of *Campbell*, with its significant depreciation of the second factor where parodies commenting on an original are concerned, we are satisfied that the balance here markedly favors the defendant. Moreover, we are aware of no "generalized equitable considerations" beyond the four statutory factors, *see American Geophysical Union*, 60 F.3d at 931, that are relevant to this dispute.

### Conclusion

For these reasons, we affirm the judgment of the District Court.

ic—is a risk artists and their subjects must ac-     cept.