COLUMBIA PICTURES INDUSTRIES, INC., a Delaware Corporation and Sony Pictures Entertainment Inc., A Delaware corporation, Plaintiffs,

v.

MIRAMAX FILMS CORP., a New York corporation; Mayfair Entertainment International, Inc., a foreign corporation, Defendants.

No. CV 98–2793 ABC (AIJx).

United States District Court, C.D. California.

May 29, 1998.

Patricia L. Glaser, Ronald E. Guttman, Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, Los Angeles, CA, for Plaintiffs.

Martin D. Singer, Ann Loeb, Lavely & Singer, Los Angeles, CA, for Defendants.

Findings of Fact and Conclusions of Law
in Support of Preliminary Injunction
and Preliminary Injunction

COLLINS, District Judge.

The Motion for a Preliminary Injunction of Plaintiff COLUMBIA PICTURES INDUSTRIES, INC. and SONY PICTURES ENTERTAINMENT INC. came on for hearing on May 27, 1998. The Court has reviewed the materials submitted by the parties, the arguments of counsel, and the case file. The Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### "Men In Black"

1. Columbia produced the theatrical motion picture "Men In Black" for $90 million. Declaration of Bryan Lee, ¶ 3. "Men In Black" opened on July 2, 1997 on 3,020 screens in the United States and Canada. Lee Decl., ¶ 3. Following the opening of "Men In Black," exhibitors added screens for the film. Lee Decl., ¶ 3. During the week of July 25, 1997, " 'Men In Black" was showing on 3, 180 screens in the United States and Canada. Lee Decl., ¶ 3. "Men In Black" ran in theaters for over 21 weeks and grossed over $250 million at the box office in North America. Lee Decl., ¶ 3. Since July 1997, "Men In Black" has shown in approximately 5,800 screens worldwide and has grossed over $337 million in its international theatrical run. Lee Decl., ¶ 4.

2. Since November 25, 1997, Columbia has shipped over 20 million video cassettes of "Men In Black" throughout the world. Lee Decl., ¶ 5. Columbia also continues to exploit "Men In Black" throughout the world in various television, cable, pay-per-view, hotel, airline and merchandising licensing. Lee Decl., ¶ 5.

3. The success of "Men In Black" has led to the international television broadcast of an animated television show called "Men In Black: The Series". Lee Decl., ¶ 6. "Men In Black: The Series" has been renewed for a second (1998–1999) season. Lee Decl., ¶ 6. "Men In Black: The Series" is also distributed in the foreign home video market. Lee Decl., ¶ 6.

4. Columbia has engaged in an extensive merchandise licensing campaign which includes licensing of posters, toys, video games, T-shirts, hats, shoes, trading cards, games, greeting cards, and various book categories. Lee Decl., ¶ 7. Further, millions of copies of the single and musical soundtrack to "Men In Black" have been sold. Lee Decl., ¶ 8. Columbia owns the master recording of the "Men In Black" soundtrack and co-owns the publishing rights in the musical composition "Men In Black." Lee Decl., ¶ 8. Columbia is currently developing a sequel to "Men In Black." Lee Decl., ¶ 10.

## "The Big One"

5. "The Big One" opened on April 10, 1998. Declaration of Mark Gill, ¶ 7. "The Big One" is a documentary film written and directed by Michael Moore. Moore employs his wit and interviewing skills in "The Big One" in an effort to expose the consequences of corporate America's focus on achieving maximum profits notwithstanding the adverse consequences that frequently accompany such pursuit including plant closings, employee layoffs, and employee benefit reductions. Gill Decl., ¶ 10.

6. Documentaries like "The Big One" are not widely released because there is insufficient public interest in these types of films to support such exposure. Gill Decl., ¶ 11. "The Big One" has never been shown in more than 55 theater at a given time. Gill Decl., ¶ 12. "The Big One" is currently near the end of its theatrical exploitation. Gill Decl., ¶ 3.

### The Advertising

7. Commencing in late 1996, Columbia engaged in a widespread advertising campaign to promote "Men In Black." Declaration of Joseph Foley, ¶ 2. The advertising included the dissemination of a copyrighted promotional poster ("MIB Poster"). *See* Foley Decl., ¶ 2, Exh. B (certificate of copyright registration for the MIB Poster). During 1997, the MIB Poster appeared in newspapers, magazines, billboards, and theater displays throughout the United States and the world. Foley Decl., ¶ 3. The MIB Poster was used for the videocassette jackets of the film and continues to be exhibited in video stores and retail outlets in connection with video sales and rentals. Foley Decl., ¶ 5.

8. In addition to the MIB Poster, Columbia also distributed two copyrighted trailers to attract viewers to the film ("MIB Trailers"). *See* Foley Decl., ¶ 4, Exhs. B & C (certificate of copyright registration for the MIB Trailers). The MIB Trailers contained excerpts from the film and original, creative audio/visual elements. Foley Decl., ¶ 4.

9. Prior to the release of "The Big One," Defendants commenced an advertising campaign consisting of in-theater posters (the "TBO Poster"), newspaper ads, and a trailer (the "TBO Trailer"). Gill Decl., ¶ 7. Posters were sent to theaters at the end of March.

Gill Decl., ¶ 7. Newspaper ads commenced at the end of March. Gill Decl., ¶ 7. The TBO Trailer began showing in theaters beginning March 30, 1998. Gill Decl., ¶ 7. Defendants did not send any of the complained of advertising materials to any countries other than the United States and Canada. Gill Decl., ¶ 26.

10. The MIB Poster features Will Smith and Tommy Lee Jones, the film's stars, wearing black suits, white shirts, black ties, and sunglasses. Foley Decl., ¶ 2, Exh. A. The men are standing in front of a nighttime New York City skyline, carrying over-sized weapons and have serious expressions. Foley Decl., ¶ 2, Exh. A. The MIB Poster's tag line appears above the men and reads: "PROTECTING THE EARTH FROM THE SCUM OF THE UNIVERSE." Foley Decl., ¶ 2, Exh. A.

11. The TBO Poster features Michael Moore, wearing a black suit, white shirt, black tie, and sunglasses. Gill Decl., Exh. B. Moore's hair is disheveled and he is also wearing a black baseball cap. Gill Decl., Exh. B. Moore is standing in front of a nighttime New York City skyline, carrying an over-sized microphone and is smirking. Gill Decl., Exh. B. The TBO Poster's tag line appears above Moore and reads: "PROTECTING THE EARTH FROM THE SCUM OF CORPORATE AMERICA ." Gill Decl., Exh. B.

12. The MIB Trailers introduce the audience to characters and the "Men In Black" story. One trailer begins with scenes of the characters' dress—sunglasses, black suits, white shirts, and black ties. The trailer continues with a display of the characters' various weapons. Both MIB Trailers show excerpts from "Men In Black" and end with a voice over announcing the film's tag line, "protecting the earth from the scum of the universe." The MIB Trailers ends with a shadow of Smith and Jones superimposed over the letters "MIB".

13. The TBO Trailer also introduces the audience to Moore and the story of "The Big One." The TBO Trailer contains an assembly line production of Moore's dress, including sunglasses and black suits. The assembly line also features baseball caps and muffins.

The TBO Trailer contains a scene with Moore entering a room dressed in sunglasses, a black suit, white shirt, and black tie. Moore is also wearing a baseball cap and is carrying an over-sized weapon. The TBO Trailer plays the same music contained in the "Men In Black" soundtrack. The TBO Trailer ends with a voice over announcing the film's tag line, "protecting the earth from the scum of corporate America." The TBO Trailer ends with a shadow of Moore superimposed over the letters "TBO".

14. After Plaintiffs notified Defendants of the allegedly infringing poster and trailer, counsel met and discussed whether they could reach an agreement whereby Miramax would discontinue using its allegedly infringing poster and film trailers for "The Big One." Declaration of Ronald E. Guttman, ¶ 2. Although the parties did not execute a formal written agreement on the subject, Miramax discontinued use of the complained of advertising shortly after "The Big One" opened. Gill Decl., ¶ 25.

15. On April 21, 1998, Miramax's counsel informed Plaintiffs that Miramax: (1) replaced the complained of print ad; (2) notified theaters to discontinue showing the trailer; (3) will remove the complained of image from its website by the close of business on April 24, 1998; and (4) will no longer send out the thirty second promotional television spot containing the complained of content and instructs its promotional and publicity agencies to advise television and cable entities that received the spot that they are no longer authorized to broadcast it. Declaration of Alan R. Friedman, Exh. A. Mark Gill, President of Miramax's Los Angeles office declares: "Miramax does not intend to, and will not, resume the use of "The Big One" advertising at issue." Gill Decl., ¶ 28.

16. The only complained of advertising that remains is the TBO Poster which has been in use since the beginning of April, 1998. Gill Decl., ¶ 29.

17. Any conclusions of law which are deemed to be findings of fact are incorporated herein by reference.

### CONCLUSIONS OF LAW

1. Jurisdiction and venue are proper in this court.

■ 2. The withdrawal of the complained of advertising does not render this action moot.

■ 3. "[T]he court's power to grant injunctive relief survives discontinuance of the illegal conduct." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). The voluntary cessation of allegedly illegal conduct does not render a case moot, unless there is no reasonable expectation that the wrong will be repeated. *See Public Utilities Comm'n v. FERC*, 100 F.3d 1451, 1458 (9th Cir.1996); *see also United States v. Laerdal Mfg. Co.*, 73 F.3d 852, 854 (9th Cir.1995) ("A district court cannot issue an injunction unless 'there exists some cognizable danger of recurrent violation.' ") (citing *W.T. Grant*, 345 U.S. at 633, 73 S.Ct. 894).

4. In this case, although the theatrical run for "The Big One" is near an end, *see* Gill Decl., ¶ 3, ancillary markets for the film still exist—pay-per-view, cable, television, hotel, or home video markets. Thus, a preliminary injunction will serve to prevent future exploitation of the complained of advertising. Further, although Defendants have voluntarily ceased use of the complained of advertisements, they have not entered into a written agreement with Plaintiffs which would have provided Plaintiffs with a remedy should Miramax breach the agreement. *See* Reply Decl. of Ronald E. Guttman, ¶¶ 2–3.[1]

---

**1.** Additionally, the Court notes that Defendants have *not* withdrawn all of the complained of posters. Rather, Miramax is apparently continuing to use its TBO Poster at in-theater locations. *See* Opposition at 6 ("The only remaining advertising consists of the posters that were previously sent to the theaters."); *see also* Friedman Decl., Exh. A (indicating that although Miramax "will make no new distribution of the complained of poster," Miramax did not agree to prevent the continued use of the in-theater TBO Poster). *But see*, Reply at 14 n. 9 ("Columbia has not requested that Miramax 'replace' any previously distributed posters; only that Miramax not distribute or disseminate any additional infringing posters."). Thus, it appears that Defendants have not voluntarily halted the allegedly illegal conduct and that Plaintiffs have an actual, realized fear of continuing conduct requiring affirmative injunctive relief.

5. Moreover, "[i]n copyright and trademark cases, irreparable injury is presumed upon a showing of likelihood of success." *Dr. Seuss Enter., L.P. v. Penguin Books USA, Inc.*, 924 F.Supp. 1559, 1574 (S.D.Cal.1996), *aff'd*, 109 F.3d 1394 (9th Cir.), *cert. dismissed*, — U.S. —, 118 S.Ct. 27, 138 L.Ed.2d 1057 (1997); *see also Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 826 (9th Cir.1997) (recognizing that "a presumption of irreparable injury arises if the plaintiff is able to show a likelihood of success on the merits of its copyright infringement claim"); *Johnson Controls, Inc. v. Phoenix Control Sys., Inc.*, 886 F.2d 1173, 1174 (9th Cir.1989) ("[I]n a copyright infringement claim, a showing of a reasonable likelihood of success on the merits raises a presumption of irreparable harm."); *Apple Computer, Inc. v. Formula Int'l Inc.*, 725 F.2d 521, 525 (9th Cir.1984) (same). In this case, the Court presumes irreparable injury because Plaintiffs have established a likelihood of success on the merits.

## Preliminary Injunction Standard

6. Plaintiffs have met the requirements for obtaining a preliminary injunction. Plaintiffs have demonstrated a probable success on the merits, and the possibility of irreparable injury. *See* Schwarzer, et al., *Civil Procedure Before Trial* § 13:45; *see also International Jensen v. Metrosound U.S.A.*, 4 F.3d 819, 822 (9th Cir.1993); *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir.1991).

## Probability of Success: Plaintiffs' Copyright Infringement Claim

7. Plaintiffs have established a probability of success on the merits of their copyright infringement claim.

8. To establish copyright infringement, Plaintiffs must prove: (1) that Plaintiffs owned the allegedly infringed work; and (2) that Defendants copied Plaintiffs' copyrighted work. *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir.1996). "Copying" is composed of two parts: "(1) circumstantial evidence of the defendant's access to the copyrighted work; and (2) substantial similarity between the copyrighted work and the defendant's work." *Universal City Studios, Inc.*

*v. Film Ventures Int'l, Inc.*, 543 F.Supp. 1134, 1140 (C.D.Cal.1982); *see also Direct Marketing of Virginia v. E. Mishan & Sons, Inc.*, 753 F.Supp. 100, 104 (S.D.N.Y.1990) ("Where direct evidence of copying is unavailable, plaintiffs in a copyright infringement action can prove copying indirectly by proving access and substantial similarity.") (citing 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* 13.01[B] (1990)).

9. The parties do not dispute that Plaintiffs owned the copyrighted work. Plaintiffs have Certificates of Copyright Registration for the copyright to the film "Men In Black," the MIB Poster, and the MIB Trailers. *See* Declaration of Joseph Foley, Exhs. B, C, and D; Guttman Decl., Exh. B.

## Access

10. "Access is proven when the plaintiff shows that the defendant had an opportunity to view or to copy plaintiffs' work." *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir.1977). In this case, Defendants concede that they had access to Plaintiffs' copyrighted work. *See* Opposition at 10 (" 'Copying' requires both evidence of access to the first work (not in dispute here) and substantial similarity between the works.") (emphasis added); *see also Shaw v. Lindheim*, 919 F.2d 1353, 1362 (9th Cir.1990) (noting that Defendants' "admission that they had access to [Plaintiffs' work] is a factor to be considered in favor of [Plaintiffs]").

## Substantial Similarity

11. The Court concludes that a "substantial similarity" exists between the MIB Poster and Trailers and the TBO Poster and Trailer. *See Universal City.* 543 F.Supp. at 1140 (noting that the Court must consider "whether there is a likelihood that Plaintiffs will succeed on the merits at trial on the issue of substantial similarity").

12. In *Krofft*, the Ninth Circuit established a two-part test to determine whether substantial similarity exists between the plaintiffs' and defendants' works. The first inquiry is the "extrinsic" test and asks if there is similarity of ideas. *See Krofft*, 562

F.2d at 1164; *see also Universal City,* 543 F.Supp. at 1140 ("The first inquiry is whether there is substantial similarity between the general ideas of the two works."). "Substantial similarity" refers to similarity of expression, not merely similarity of ideas or concepts. *See* 17 U.S.C. § 102(b). "[S]ubstantial similarity in the expression of an idea may appear from the mood evoked by the work as a whole." *See v. Durang,* 711 F.2d 141, 144 (9th Cir.1983). The objective extrinsic test is based on specific expressive elements, and focuses on "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters and sequence of events" in the two works. *Kouf v. Walt Disney Pictures & Television,* 16 F.3d 1042, 1045 (9th Cir.1994). The first inquiry allows "analytic dissection." *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1398 (9th Cir.), *cert. dismissed,* 118 S.Ct. (1997).[2]

13. The second inquiry is the "intrinsic" test and asks if an "ordinary reasonable person" would perceive a substantial taking of protected expression. *Dr. Seuss,* 109 F.3d at 1397 (citing *Krofft*). The "intrinsic" test looks for substantial similarity in the "total concept and feel" of two works. *Litchfield v. Spielberg,* 736 F.2d 1352, 1356 (9th Cir. 1984).[3]

14. The Ninth Circuit has modified the "*Krofft*" test. *See, Apple Computer Inc. v. Microsoft Corp.,* 35 F.3d 1435, 1442–43 (9th Cir.1994). The Ninth Circuit has stated:

As it has evolved, however, the extrinsic test now objectively considers whether there are substantial similarities in both ideas and expression, whereas the intrinsic test continues to measure expression subjectively.... Because only those elements of a work that are protectable ... can be compared when it comes to the ultimate question of illicit copying, we use analytic dissection to determine the scope of copy-

right protection before works are considered 'as a whole.'

*Id.* (citation omitted). "Because the criteria incorporated into the extrinsic test encompass all objective manifestations of creativity, the two tests are more sensibly described as objective and subjective analyses of expression, having strayed from *Krofft*'s division between expression and ideas." *Shaw,* 919 F.2d at 1357.

15. Under the extrinsic test the MIB Poster and Trailers are substantially similar to the TBO Poster and Trailer.

16. Applying analytic dissection under the extrinsic test, the Court declines to consider the black suits, ties, and sunglasses, the New York skyline. *See Apple Computer,* 35 F.3d at 1446 ("[T]he party claiming infringement may place 'no reliance upon any similarity in expression resulting from' unprotectable elements."); *Walker v. Time Life Films, Inc.,* 615 F.Supp. 430, 435 (S.D.N.Y. 1985) ("[C]opyright protection does not extend to historical or contemporary facts, material traceable to common sources or in the public domains, and *scenes a faire*."); *Alexander v. Haley,* 460 F.Supp. 40, 45 (S.D.N.Y. 1978) ("Where common sources exist for the alleged similarities, or the material that is similar is otherwise not original with the plaintiff, there is no infringement."). The Court also declines to consider the tag line. *See* 17 C.F.R. § 202.1(a) ("Words and short phrases such as names, titles, and slogans are not subject to copyright.").[4]

17. Even without considering the black suits, ties, sunglasses, New York skyline, and the tag line, however, substantial similarity exists. Plaintiffs have a protectable interest in idea and expression based on the total "look and feel" of the MIB Poster and Trailers. *See Apple Computer, Inc. v. Microsoft*

---

**2.** "'Analytic dissection' focuses on isolated elements of each work to the exclusion of the other elements, combination of elements, and expressions therein." *Dr. Seuss,* 109 F.3d at 1398.

**3.** While the intrinsic test for expression is uniquely suitable for resolution by the trier of fact, the Court may properly consider the intrinsic test at the preliminary injunction stage. The question before the Court is "whether it is likely

that Plaintiffs will prevail on the merits or, in other words, persuade the jury that there is substantial similarity of expression and that, therefore, Defendants have infringed [their] work." *Universal City,* 543 F.Supp. at 1140–41.

**4.** Columbia expressly disavows reliance on these items. *see* Reply at 6 ("Columbia is not claiming that it has a copyright to the men's outfits, to the New York skyline, or to the tag line.").

**1186**

*Corp.*, 799 F.Supp. 1006, 1026 n. 16 (N.D.Cal. 1992), *aff'd*, 35 F.3d 1435 (9th Cir.1994).

18. The TBO Poster is substantially similar to the expressive ideas contained in the TBO Poster in that both contain: (1) figures carrying a large object; (2) figures of similar size with similar stances; (3) figures standing in front of a New York skyline at night; (4) a similar manner of expression; (5) similar color; and (6) an identical layout.

19. The MIB Trailers are substantially similar to the expressive ideas contained in the TBO Trailers. The trailers contain a virtually identical theme, format, pace, and sequence of events. One MIB Trailer begins with scenes of the characters' dress—sunglasses, black suits, white shirts, and black ties. The TBO Trailer contains an assembly line production of Moore's dress, including sunglasses and black suits. One MIB trailer displays the characters' various weapons. The TBO Trailer contains a scene with Moore entering a room carrying an oversized weapon. Both the MIB Trailers and the TBO Trailer end with a voice over announcing the film's tag line. Additionally, the TBO Trailer plays the same music contained in the MIB Trailers and soundtrack. Finally, the MIB Trailers end with a shadow of Smith and Jones superimposed over the letters "MIB", while the TBO Trailer ends with a shadow of Moore superimposed over the letters "TBO."

■ 20. Under the intrinsic test, the relevant inquiry is "whether an ordinary person would perceive a substantial taking of protected expression." *Severin Montres, Ltd., v. Yidah Watch Co.*, 997 F.Supp. 1262, 1997 WL 855966, at *5 (C.D.Cal. Nov.26, 1997). An ordinary viewer would consider the posters and trailers to be substantially similar based on the above comparisons. Accordingly, the Court concludes that the TBO Poster and Trailers present a substantial taking of protected expression contained in the MIB Poster and Trailers.[5]

21. Based on the foregoing, the Court concludes that "there is a likelihood that Plaintiffs will succeed on the merits at trial on the issue of substantial similarity." *Universal City*, 543 F.Supp. at 1140.

**Fair Use Defense**

■ 22. Under a fair use analysis, Plaintiffs have established a likelihood of success on the merits of their copyright infringement claim. Thus, Plaintiffs have met their burden of establishing a probability of success on the merits.

■ 23. Fair use is an "equitable rule of reason." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 448, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). It requires a careful balancing of multiple factors "in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994). "The fair use defense 'permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'" *Dr. Seuss*, 109 F.3d at 1399 (quoting *Iowa State Univ. Research Found., Inc. v. American Broadcasting Cos.*, 621 F.2d 57, 60 (2d Cir.1980)).

24. The Copyright Act sets forth four factors for courts to consider in determining

---

5. Defendants' claim that the TBO Poster is not substantially similar to the MIB Poster is also under cut by Defendants' admission that the advertising campaign for "The Big One" was intended to parody "Men In Black." *See* Gill Decl., ¶ 4 ("The ad campaign to promote the Michael Moore documentary, *The Big One*, is and was intended to be, a *parody* of advertising plaintiffs used for their film *Men In Black*. *The Big One* poster and trailer are different from, yet lampoon, the attitude and message of the *Men In Black* ad."). A parody is necessarily similar to the original. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) ("For the purposes of copyright law, the nub of the definitions, and the heart of any parodist's claim to quote from exist-

ing material, is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works...."). Although Defendants' admission does not conclusively establish the element of substantial similarity, it is nevertheless good circumstantial evidence that the similarities in protected expression arise from copying rather than independent creation. *See Dr. Seuss*, 924 F.Supp. at 1565 n. 4; *see also Shaw* 919 F.2d at 1362 ("noting that although a title cannot be copyrighted, the Ninth Circuit acknowledged and considered defendants' admitted copying of Plaintiff's title in determining whether there is substantial similarity of protected expression between the two works").

if a fair use defense exists in a given case: "(1) the purpose and character of the accused use; (2) the nature of the copyrighted work; (3) the importance of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the accused use on the potential market for or value of the copyrighted work." *Dr. Seuss,* 109 F.3d at 1399 (quoting 17 U.S.C. § 107).

25. Because fair use is an affirmative defense, Defendants bear the burden of proof on all of its factors. *See id.* at 1403.

### Purpose and Character of the Use

26. The first fair use factor weighs strongly against a finding of fair use.

27. The first fair use factor considers "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). Under this factor, the inquiry is whether the infringing work merely supersedes the original, or whether and to what extent the new work is "transformative" and alters the original with new expression, meaning or message. *See Dr. Seuss,* 109 F.3d at 1400.

28. The Ninth Circuit "has adopted the 'conjure up' test where the parodist is permitted a fair use of a copyrighted work if it takes no more than is necessary to 'recall' or 'conjure up' the object of his parody." *Id.*

29. The Supreme Court has defined parody as follows:

> For the purposes of copyright law, the nub of the definitions, and the heart of any parodist's claim to quote from existing material, is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works.... If, on the contrary, the commentary has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commercially, loom larger.

*Campbell,* 510 U.S. at 580, 114 S.Ct. 1164 (citations omitted). The Ninth Circuit has noted that "[p]arody is regarded as a form of social and literary criticism, having a socially significant value as free speech under the First Amendment." *Dr. Seuss,* 109 F.3d at 1400.

30. The Supreme Court has also drawn a distinction between parody and satire: "Parody needs to mimic an original to make its point, and so has some claim to use the creation of its victim's (or collective victims') imagination, whereas satire can stand on its own two feet and so requires justification for the very act of borrowing." *Campbell,* 510 U.S. at 580, 114 S.Ct. 1164. Thus, a distinction exists between a parody, which targets the copyrighted work, and satire, which uses the copyrighted work as a vehicle to poke fun at another target. *See Dr. Seuss,* 109 F.3d at 1400.

31. Advertisements are entitled to less indulgence than other forms of parody. *Harper & Row Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 562, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) (The fact that "a publication was commercial as opposed to nonprofit is a separate factor that tends to weigh against a finding of fair use."); *see also Campbell,* 510 U.S. at 585, 114 S.Ct. 1164 (The use "of a copyrighted work to advertise a product, even in a parody, will be entitled to less indulgence under the first factor of the fair use enquiry than the sale of a parody for its own sake."). The TBO Poster and Trailer are part of an advertising campaign intended to attract viewers to see the film. Thus, ads for "The Big One" have a commercial, rather than nonprofit or educational purpose. *See* 17 U.S.C. § 107(1).

32. Nevertheless, Defendants contend that the TBO Trailer pokes fun at the "Men In Black" image by suggesting that an unfit documentarian may "assume the mantle of hero and do battle against the villains of corporate America, as the [Men In Black] do battle against aliens." Opposition at 14. Defendants argue that advertising for "The Big One" "does not merely use the original concept to promote itself or as a vehicle to satirize some other subject. Rather, [the] advertising directly targets ['Men In Black'] for comment." Opposition at 14.

33. As a general matter, the fair use defense calls for "case-by-case-analysis" and "is

not to be simplified with bright-line rules." *Campbell*, 510 U.S. at 577, 114 S.Ct. 1164. Nevertheless, several cases may assist the Court's inquiry.

34. In *Campbell*, the Supreme Court considered whether the rap group 2 Live Crew's commercial parody of Roy Orbison's song, "Oh, Pretty Woman" constituted a fair use. *Id.* at 571–72, 114 S.Ct. 1164. In addressing the first factor, the Court stated that "2 Live Crew's song reasonably could be perceived as commenting on the original or criticizing it, to some degree." The Supreme Court noted that 2 Live Crew's song could be taken "as a comment on the naivete of the original of an earlier day, as a rejection of its sentiment that ignores the ugliness of street life and the debasement that it signifies." *Id.* at 583, 114 S.Ct. 1164.

35. In *Dr. Seuss*, the Ninth Circuit considered whether a poetic account of the O.J. Simpson murder trail entitled "The Cat NOT in the Hat! A Parody by Dr. Juice", which might infringe on the well-known "The Cat in the Hat" by Dr. Seuss, could be excused as a parody under the fair use doctrine. In addressing the first factor, the Ninth Circuit stated that although "The Cat NOT in the Hat!" broadly mimics Dr. Seuss' characteristic style, "it does not hold his style up to ridicule." *Dr. Seuss*, 109 F.3d at 1401. The Court noted that the authors of "The Cat NOT in the Hat!" merely used the Cat's stove-pipe hat, the narrator (Dr. Juice), and the title "to get attention" or "to avoid the drudgery in working up something fresh." *Id.* (quoting *Campbell*, 510 U.S. at 580, 114 S.Ct. 1164). The Court concluded that there was "no effort to create a transformative work with 'new expression, meaning, or message.'" *Id.* (quoting *Campbell*, 510 U.S. at 578, 114 S.Ct. 1164).

36. In this case, The TBO Poster and Trailer do not create a "transformative work." *See Dr. Seuss*, 109 F.3d at 1401. The TBO advertisements cannot reasonably be perceived as commenting on or criticizing the ads for "Men In Black." *See Campbell*,

510 U .S. at 583, 114 S.Ct. 1164. The TBO Poster merely incorporates several elements of the MIB Poster: figures with a particular stance carrying large weapons, standing in front of the New York skyline at night, with a similar layout. Similarly, the TBO Trailer appears to be little more than an effort to "get attention" for "The Big One" and "avoid the drudgery in working up something fresh." *Dr. Seuss*, 109 F.3d at 1401 (quoting *Campbell*, 510 U.S.at 580, 114 S.Ct. 1164).

37. The TBO Poster and Trailer are designed solely for the purpose of attracting viewers to see "The Big One." As such, Miramax has merely used the copyrighted work as a vehicle to poke fun at another target—corporate America. It has not used its advertising to comment on or criticize the copyrighted work.

38. The TBO Poster, unlike the MIB Poster, depicts Moore with "grinning bravado," and a "rumpled appearance." *See* Opposition at 13. Nevertheless, "[b]eing different from an original does not inevitably 'comment' on the original." *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 114 (2d Cir.1998).[6]

39. Rather than commenting on or criticizing Plaintiffs' ads, Defendants' ads seek to use Plaintiffs' ads as a vehicle to entice viewers to see "The Big One" in the same manner as Plaintiffs used their own ads to entice viewers to see "Men In Black." In such circumstances, Defendants have not created a transformative work which alters the original with new expression, meaning or message. *See Dr. Seuss*, 109 F.3d at 1400.

### Nature of the Copyrighted Work

40. The second fair use factor considers "the nature of the copyrighted work." 17 U.S.C. § 107(2). "This factor recognizes that creative works are 'closer to the core of intended copyright protection' than informational and functional works, 'with the consequence that fair use is more difficult to establish when the former works are copied.'" *Dr.*

---

**6.** The Second Circuit stated that the smirking face of actor Leslie Nielsen in the infringing work contrasted so strikingly with the serious expression of Moore, "the ad may reasonably be perceived as commenting on the seriousness, even the pretentiousness, of the original." *Leibo-*

*vitz*, 137 F.3d at 114. The Court ultimately concluded that a "photographer posing a well known actress in a manner that calls to mind a well known painting must expect, or at least tolerate, a parodist's deflating ridicule." *Id.* at 114–15.

*Seuss,* 109 F.3d at 1400 (quoting *Campbell,* 510 U.S. at 586, 114 S.Ct. 1164). The Ninth Circuit has stated that "this factor typically has not been terribly significant in the overall fair use balancing." *Id.* at 1402.

41. In this case, the parties do not dispute that the copyrighted work reflects original, creative, expression. Thus, the Court finds that "the creativity, imagination and originality embodied in" the MIB Poster Trailers "tilts the scale against fair use." *Id.; see also Leibovitz,* 137 F.3d at 115.

### Importance of Portion Used In Relation to the Copyrighted Work as a Whole

42. The third fair use factor considers whether the amount and substantiality of the portion used in relation to the copyrighted work as a whole are reasonable in relation to the purpose of the copying. *See* 17 U.S.C. § 107(3); *Dr. Seuss,* 109 F.3d at 1402. "This factor really raises the question of substantial similarity ... rather than whether the use is 'fair.'" *Dr. Seuss,* 109 F.3d at 1402. The court must consider "the persuasiveness of a parodist's justification for the particular copying done, and the enquiry will harken back to the first of the statutory factors [because] the extent of permissible copying varies with the purpose and character of the use." *Campbell,* 510 U.S. at 586–87, 114 S.Ct. 1164.

43. As discussed above, the TBO Poster and Trailer are substantially similar to the expressive ideas contained in the MIB Poster and Trailers. The Court has also concluded, under the first statutory factor, that Defendants' proffered justifications are not persuasive because Defendants have not created a transformative work which alters the copyrighted work with new expression, meaning or message. *See Dr. Seuss,* 109 F.3d at 1400.

44. The amount and substantiality of the portion used in relation to the copyrighted work as a whole was not reasonable. Thus,

the third factors weighs against a finding of fair use.

### Effect of the Accused Use on the Potential Market

45. The final fair use factor also militates against a finding of fair use.

46. The final fair use factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Under this factor, the court must consider both the extent of market harm caused by infringing work and whether unrestricted and widespread dissemination would hurt the potential market for the original and its derivatives. *See Dr. Seuss,* 109 F.3d at 1403.

47. This factor requires the Court to strike a balance "between the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied. The less adverse effect that an alleged infringing use has on the copyright owner's expectation of gain, the less public benefit need be shown to justify the use." *MCA, Inc. v. Wilson,* 677 F.2d 180, 183 (2d Cir.1981) (citations omitted).

48. Defendants have not met their burden of providing affirmative evidence relating to market harm. *See Dr. Seuss,* 109 F.3d at 1403. Defendants have failed to offer any evidence as to the relevant markets or as to harm within the relevant market. Defendants have also failed to offer any evidence with respect to harm to the market for "Men In Black" derivatives.[7]

### Irreparable Injury: Plaintiff's Copyright Infringement Claim

49. In copyright cases, "irreparable injury is presumed upon a showing of likelihood of success." *Dr. Seuss,* 924 F.Supp. at 1574; *see also Cadence,* 125 F.3d at 826; *Johnson Controls,* 886 F.2d at 1174; *Apple Computer,* 725 F.2d at 525.

---

7. The only arguably relevant evidence Plaintiffs have offered with respect to market harm is the declaration of Mark Gill. Gill states: "Based on my understanding of marketing and of the marketing of "Men In Black" in particular, no market for "Men In Black" would be adversely af-

fected by the continued use of these posters...." Gill Decl., ¶ 30. The Court finds Gill's speculative assertion lacking in factual support. Accordingly, the Court finds this evidence unpersuasive.

50. Because Plaintiffs have established a likelihood of success on the merits in this case, the Court presumes irreparable injury.

### Conclusion

51. Any findings of fact deemed to be conclusions of law are incorporated herein by reference.

52. For the reasons set forth above, the Court hereby GRANTS Plaintiffs' motion for a preliminary injunction.[8]

### ORDER

IT IS HEREBY ORDERED:

1. That Defendants MIRAMAX FILMS CORP., and MAYFAIR ENTERTAINMENT INTERNATIONAL, INC., their officers, directors, principals, agents, servants, employees, successors and assigns, and all those acting in concert or participation with them, are enjoined from advertising or otherwise promoting "The Big One" in the following manner:

a. No poster or picture may contain the combination of: (1) a New York skyline at night, depicted towards the bottom of the image, in a purple/blue tint; (2) a figure in the foreground wearing a black suit, white shirt, black tie and sunglasses, having a similar stance as Will Smith and Tommy Lee Jones in the MIB Poster; (3) a figure carrying an oversized weapon or microphone; and (4) the tag line "protecting the earth from the scum of corporate America".

b. No trailer may contain the combination of: (1) an assembly line production including sunglasses and black suits; (2) a figure wearing a black suit, white shirt, black tie, and sunglasses; (3) a figure carrying an oversized weapon or microphone; and (4) the tag line "protecting the earth from the scum of corporate America".

2. Based on defense counsel's representation that less than twenty TBO Posters are currently displayed at in-theater locations, the Court does not Order Defendants to remove those remaining posters.

3. Bond shall be set at $500 under Federal Rule of Civil Procedure 65.

---

**8.** Because the Court grants Plaintiffs' motion based upon an analysis of its copyright claim, the Court does not address Plaintiffs' remaining claims.